## UNITED COAL CO. v. LEHIGH COAL & NAVIGATION CO.

(District Court, D. Rhode Island.   February 5, 1920.)

### No. 1325.

SALES ⬥⟾52(5)—EVIDENCE AS TO TERMS OF CONTRACT FOR SALE OF COAL.
      Evidence *held* not to sustain plaintiff's allegation of a parol contract
      with defendant for the purchase and sale of 35,000 tons of coal, but to
      show that the contract was for 10,000 tons, with a promise by defendant
      to furnish more, if able.

At Law.   Action by the United Coal Company against the Lehigh Coal & Navigation Company.   Trial to court.   Judgment for defendant.

Huddy, Emerson & Moulton, of Providence, R. I., for plaintiff.
Tillinghast & Collins, of Providence, R. I., for defendant.

BROWN, District Judge.   This is an action of assumpsit, in which jury trial is waived.

The principal question in this case is a question of fact.   Did the defendant agree to sell, and the plaintiff to buy, 35,000 tons of coal?

There is a direct conflict of testimony as to the terms of an oral agreement made at Providence, R. I., June 26, 1916.   Mr. Lawrence, plaintiff's representative, testifies to an oral agreement for 10,000 tons at June and July prices, and for 25,000 tons at the circular price at the date of delivery.   Mr. Baker, defendant's representative, agrees with Mr. Lawrence as to a contract for 10,000 tons at June and July prices, but denies that a contract was made for 25,000 tons additional, though he states that he told Lawrence that the Lehigh Company would give him more coal, if able to do so.   Mr. Johnson, defendant's Eastern sales agent, corroborates the testimony of Mr. Baker.

Subsequent to this oral conversation, defendant, on June 27, 1916, sent to plaintiff the following letter (Plaintiff's Exhibit 3):

"June 27, 1916.

"United Coal Co., 31 Westminster St., Providence, R. I.   Attention Mr. Frank M. Lawrence, Prest.—Dear Sir:  Your letter of June 22d was forwarded to me and duly received in Boston on the 26th inst. prior to my visit to Providence, in accordance with telegraphic appointment made from Portland last week.   This letter is to confirm our conversation in your office in the matter of your requirements for this year, which you have placed at approximately 35,000 tons.   The understanding which we reached is as follows:

"That we are to protect you to the extent of:
      5,000 tons at the June price
      5,000 tons at the July price
alongside your dock at Providence, the remaining tonnage to be at prices current at time of shipment.

"The above tonnage of 10,000 tons is in addition to barge now loading for you, which is to go forward this week and carry the June price.

"In view of your increased tonnage we will continue to pay you $100 per month as proportion of the expense of your uptown office and to assume half of your advertising expenses, on account of 'Old Company's Lehigh' coal to an amount not exceeding $250.

"The matter of shipping coal to you on consignment basis is to be left open for the present, pending opinion of counsel as to certain legal questions involved.                    Very truly yours,
"HFB/S                                  [Signed]  H. F. Baker, Vice President."

The defendant lays stress upon the concluding paragraph, leaving open the question of shipping coal on consignment, as confirming its contention that no agreement was concluded as to an additional 25,000 tons.  This matter is referred to also in a letter of June 22, 1916, from plaintiff to defendant (Exhibit 1), as follows:

"I am not averse to your consignment plan, the details of which can be quickly arranged."

It appears that previous to June, 1916, a conference was had at Philadelphia between Mr. Mauran and Mr. Lawrence, representing the plaintiff, and Mr. Baker, Mr. Warriner, and Mr. Johnson, representing the defendant, concerning the plaintiff's requirements for coal for the coming year.  Mr. Mauran testifies that he then stated that the plaintiff was prepared to take 35,000 tons, and also said:

"I suggested it might be difficult for us to pay that much all at once, if they sent it all at once, and he [Mr. Baker] told me that they were working out a scheme of consignment, and they would be willing to give us something more definite on that; that it was only a matter of detail to be worked out by consulting their attorneys," etc.

Mr. Baker testifies that he told Mr. Mauran—

"that we would not extend the credit that would be necessary to carry a large stock of coal at Providence unless we could hold the title to the coal."

It seems quite clear that this consignment plan was due both to an unwillingness of Mr. Mauran to assume an immediate obligation to pay for so large a tonnage as 35,000, and an unwillingness of the defendant to extend to plaintiff so large a credit.  That this question of supplying coal to the defendant on consignment, rather than on credit, was not settled at the oral interview on June 26, appears from the express reservation in the letter of June 27, 1916.

In a letter of August 4, 1916 (Plaintiff's Exhibit 5), plaintiff says:

"Following out your plan of shipping coal to us on consignment, we have erected a trestle which gives us added storage room for about 8,000 tons."

The testimony of Mr. Baker and Mr. Johnson that the sale was limited to the amount of 10,000 tons is consistent with the testimony that the defendant was unwilling to extend so large a credit, and the plaintiff loth to assume so large an obligation as was involved in a contract for 35,000 tons.

It does not appear that any new reasons were advanced by Mr. Lawrence at the interview of June 26 for changing the former understanding on the subject of credit.  If Mr. Lawrence's version of the interview is correct, then we are unable to account for the express reservation of the consignment question in the letter that followed the oral interview, or for the sudden change in the defendant's attitude in giving credit for so large an amount.

I am unable to accept the suggestion that the consignment plan

related only to future years, or to coal to be sent in addition to the amount of 35,000 tons. It clearly related to coal which was part of the estimated 35,000 tons—plaintiff's requirements for 1916-17.

The account of the interview by the defendant's witnesses Baker and Johnson is more consistent with the antecedent events than that of the plaintiff's witness. While the defendant's representatives gave Mr. Lawrence assurance that coal in addition to the 10,000 tons would be sent at circular prices, if defendant "was able to do so," and while Mr. Lawrence may have interpreted this as tantamount to a contract covering the remainder of the tonnage which plaintiff desired, I am of the opinion that, according to the preponderance of proof, and according to the probabilities, and especially in view of the reservation of the consignment plan, there was no definite or completed contract to sell more than 10,000 tons.

The subsequent acts of the plaintiff are also consistent with defendant's version, and inconsistent with plaintiff's version, of that interview.

Following the usual course of business between the parties, the defendant sent plaintiff Defendant's Exhibit C, described as "Confirmation Sheet," or "Blanket Order No. 124," covering only 10,000 tons, at the June and July prices. To this plaintiff made no objection.

It is significant of the defendant's understanding of the oral interview that, in ordinary course of business, it made a record of only 10,000 tons sold, and made no entry of an order for 35,000 tons.

There are also letters from plaintiff to defendant which give strong indications that the plaintiff, at the time of writing, did not understand that defendant had agreed to sell more than 10,000 tons. Plaintiff's letter of September 22, 1916 (Plaintiff's Exhibit 13), uses the following language:

"Relying on your promise to ship us the 10,000 tons agreed upon, we have not bought as much outside coal as we should have done. * * * Will you tell me when to expect another barge to apply on our contract, on which only about 3,000 tons have been delivered?"

In a letter of October 20, 1916 (Plaintiff's Exhibit 16), plaintiff said:

"You remember that when you were in my office here I asked you to protect me on twenty thousand tons of domestic sizes at the prices agreed upon and that all that you would promise to me was ten thousand tons. Relying on getting these ten thousand tons, more or less promptly, I did not buy as much outside coal early in the season as I should have done. I have, up to the present time, bought approximately ten thousand tons of outside coal and received from the Lehigh Coal & Navigation Company only five thousand tons.

"I am still obliged to deliver thirteen thousand tons before December 1st and look to your company to assist me up to the amount agreed upon and depend upon you to ship me all you can in addition to this."

The fact that the plaintiff, subsequent to the oral interview, immediately began to make purchases of outside coal, without notice to the defendant, or without warning defendant, is very significant. Its first purchase of outside coal was in July, 1916, before defendant was in any wise in default on deliveries.

The first definite claim by plaintiff that it had a contract for 35,000 tons was in a letter from Mr. Mauran to Mr. Warriner, dated December 1, 1916 (Plaintiff's Exhibit 19). After correspondence and dis· cussion with Mr. Baker, Mr. Warriner wrote on December 20, 1916 (Exhibit 24), saying:

"The 35,000 tons which you mention as having been sold you was not, I think you will find, a firm sale for immediate delivery, but was a max· imum amount estimated as your requirements for the year. There was no obligation on your part to take that much, nor was there an obligation on our part to make immediate delivery of the entire amount."

That while the plaintiff was purchasing outside coal it did not consider itself bound to take 35,000 tons from the defendant appears from the testimony of Mr. Lawrence:

"Q. * * * Had you bought outside coal to take care of your require-ments beyond the 10,000 tons?
"A. Oh, no. That was to protect them as well as ourselves, and to relieve them of that large tonnage—anything that I could pick up in the market."

If Mr. Lawrence felt at liberty to supply the requirements of his business by buying outside coal without notice to the defendant, this indicates that he did not consider himself bound by contract to take more than 10,000 tons from defendant, or that the defendant was definitely bound to deliver more.

The case has been very fully and carefully briefed on both sides, and I have given careful consideration to both briefs, as well as to the exhibits referred to. I have also given careful consideration to the testimony, as to the close relations of the plaintiff and defendant, as indicated by the defendant's agreement to pay part of the plaintiff's office and advertising expenses, and by the fact that leniency was shown in the matter of credits. But the special and friendly relation-ship of the parties is quite as consistent with defendant's claim that the contract was for but 10,000 tons, as with plaintiff's that it was for 35,000. The closer and friendlier the relations, the greater the reliance by plaintiff on assurances that the defendant, if able, or so far as it was able, would deliver more than the 10,000 tons, and the less apparent need of a formal contract.

The briefs discuss at length the failure of the plaintiff to furnish schedules of its requirements for coal, and the effect of the plain-tiff's default or failure to make payments; the defendant contending that by the course of dealing certain conditions, including payment within 30 days from date of shipment, form part of the contract. It would not be useful to discuss these questions. Both parties are agreed that the contract was an oral contract, made in Providence, be-tween Mr. Lawrence, on the plaintiff's side, and Mr. Baker, who had with him Mr. Johnson, on the defendant's side.

I am of the opinion that the evidence fails to show that there was a meeting of minds on the question of the sale or delivery of any specific amount of coal in excess of 10,000 tons.

### Findings of Fact.

(1) I find as a fact that the defendant did not agree to sell to the plaintiff more than 10,000 tons of coal.

(2) I find as a fact that the plaintiff did not agree to purchase from the defendant more than 10,000 tons of coal.

(3) I find as a fact that the plaintiff has failed to prove that it has suffered damage by reason of breach of contract by the defendant.

The plaintiff's first request for special finding of facts is denied. In view of this denial, it seems unnecessary to pass upon the other requests.

The defendant's first, second, fifth, and seventh requests for findings of fact are granted. It seems unnecessary to rule upon the others.

The defendant's first and fourth requests for findings of law are granted. It does not seem necessary to make any ruling upon requests second and third.

A draft order for judgment for the defendant, with costs, may be presented accordingly.